In re PIERCE PACKING
COMPANY, Debtor.

Sidney R. THOMAS, Trustee, Plaintiff,

v.

The ECONOMIC DEVELOPMENT AD-
MINISTRATION OF the UNITED
STATES DEPARTMENT OF COM-
MERCE; and County of Yellowstone,
Defendants.

Bankruptcy No. 83–40438–7.
Adv. No. 94/00020.

United States Bankruptcy Court,
D. Montana.

July 11, 1994.

Dixon & Dixon, Omaha, NE, for debtor.

Sidney R. Thomas, Moulton Law Firm, Billings, MT, for trustee.

Lorraine Gallinger, Diane Barz, Asst. U.S. Attys., Billings, MT, Russell Craig, Sp. Asst. U.S. Atty., U.S. Dept. of Commerce, Office of Gen. Counsel, Washington, DC, for EDA.

Brent Brooks, Yellowstone County Atty., Billings, MT, for Yellowstone County.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this adversary proceeding, the Chapter 7 Trustee seeks a determination as to the payment of claims against the estate from assets liquidated by the Trustee, including several lienhold interests of two competing claims of the U.S. Economic Development Administration ("EDA"), and Yellowstone County, Montana ("County"). A motion for partial summary judgment as to the first priority position on certain personal property has been filed by EDA. This motion was originally uncontested due to the allegations of the complaint and the County's answer. However, the County has now changed positions, asserting under Montana law that the lien for taxes on personal property located in Yellowstone County is a prior lien to the

EDA mortgage. An amended answer has been filed to reflect that position.

EDA contests the County's motion to amend on procedural and substantive grounds. EDA claims the motion is untimely, raises a new issue in this case after the parties agreed to submit the matter to the Court on an agreed statement of facts, and is therefore prejudicial. However, the tax claims asserted by the County in the Chapter 11 case were based on real property taxes only, not personal property taxes.[1]

Nevertheless, due to the Court's decision in this Order, the amended answer has no prejudicial affect on EDA, and will therefore be allowed. Motions for summary judgment by EDA and Yellowstone County dealing with the priority of lienhold interests between EDA and Yellowstone County have also been filed, together with an Agreed Statement of Uncontroverted Facts. Briefs have been filed by each party in support of their respective positions and the matter is ready for decision. The Court will now decide the priority lien issues as to all liquidated property of the estate as requested by the Complaint of the Trustee.

## AGREED FACTS

1. On or about January 5, 1979, Security Bank, N.A., n/k/a First Interstate Bank ("Security Bank") made a loan in the amount of $2,500,000.00 to Pierce Packing Company (the "Debtor"), guaranteed ninety percent (90%) by EDA pursuant to the Public Works and Economic Development Act, 42 U.S.C. § 3121 et seq. (the "EDA Loan"). The indebtedness on the loan was evidenced by a note in the amount of $2,500,000 given by the Debtor to Security Bank. **Exhibit A.**

2. Pledged to secure the repayment of the note was all of the Debtor's inventory, equipment, general intangibles, accounts, chattel paper, contract rights, and all products and proceeds therefrom (collectively, the

1. EDA cites *Inman v. Farmers National Company*, 240 Mont. 182, 783 P.2d 1328, 1330 (1990) as authority for the proposition that a tax lien on personal property is inchoate and perfected only by levy and seizure of the taxed property. Mont. Code Ann. § 15–16–401 explicitly grants the County a first lien on the assessed property.

*Inman* so held, and noted in dicta that personal property of the taxpayer other than that assessed may also be levied upon and sold just as may any other judgment creditor, and therefore, to that property, the lien is inchoate. By reason of the decision in the case at bar, it is not necessary to apply the *Inman* holding.

"Collateral") pursuant to the terms of a Security Agreement and Financing Statement dated January 5, 1979. The security interest in such Collateral was perfected by the filing of a Financing Statement (form UCC–1) with the Secretary of State for Montana, and remained perfected at all times relevant to this matter. **Exhibit B.** (Security Bank had a perfected security interest in the Collateral under the terms of other loans, which were the subject of prior adversarial proceedings before this Court. Security Bank's other security interest in the Collateral was extinguished in the Chapter 11 proceeding, but had no effect upon the interest given by Exhibit B.)

3. The note was also secured by a mortgage given that date by the Debtor to Security Bank, encumbering certain real estate in the County of Yellowstone commonly referred to as the Pierce Packing Plant (the "Plant"). The mortgage was duly recorded in the official records of the County Clerk and Recorder of Yellowstone County, Montana, at Book 1203, Page 2622. The mortgage also conveyed to the holder "all rents, other revenues, income and other benefits arising from the use or enjoyment of all or any portion of the [Plant], or from any contracts pertaining to the use or enjoyment of such property. **Exhibit C.** (Security Bank was the holder of another mortgage encumbering the Plan, given as collateral for other loans, which were the subject of prior adversarial proceedings before this Court. Security Bank's other mortgage was satisfied in the Chapter 11 proceedings, but had no effect upon interest given by Exhibit C.)

4. On October 12, 1983, the Debtor filed a petition with this Court under Chapter 11 of the Bankruptcy Code. Prior to the filing of its petition the Debtor had been in default under the terms of the EDA Loan.

5. The County of Yellowstone filed Proofs of Claim against the estate of the Debtor (Claim Nos. 3, 4, 5, 6, and 7) representing *ad valorem* real estate tax claims totaling $439,700.53 and assessed against the Plant. **Exhibits D, E, F, G and H.** Of the amount claimed under its Proof of Claim, $90,220.86, representing the 1983 taxes, was due and payable after the date the Debtor filed Debt-

or's petition under Chapter 11. On or about February 29, 1984, the County filed amended Proofs of Claim (Claim Nos. 114, 115, 116, 117, and 118) adding penalties and interest through "2–29–84" to the amounts sought under its previously filed claims.

6. On or about February 28, 1984, Security Bank executed an Assignment of all of its right, title and interest in the EDA Loan and the collateral securing the loan to EDA, including the Mortgage and Security Agreement and Financing Statement, the UCC Financing Statement, and other pledged collateral. **Exhibit I.**

7. On May 3, 1984, Security Bank filed a Proof of Claim (Claim No. 131) in the amount of $2,103,453.73 in principal plus interest based upon the indebtedness on the EDA Loan as evidence by the note. That same date, and filed with its Proof of Claim, Security Bank filed an assignment of this Proof of Claim to EDA. **Exhibits J and K.**

8. On or about January 19, 1984, the Debtor filed an Application for an order approving assumption of a new Collective Bargaining Agreement. The Collective Bargaining Agreement provided for the payment of 15% to the union employees in accrued deferred compensation in satisfaction of outstanding claims for deferred compensation. The accrued deferred compensation was a result of a "Help the Company" program under which the employees of the Debtor agreed to defer their compensation in order to improve the financial condition of the Debtor. **Exhibit L.**

9. On February 1, 1984, the Debtor filed an Application for an order requesting payment of 15% of accrued deferred compensation to non-union management employees in complete satisfaction of the accrued deferred compensation owed to them. On February 9, 1984, the Court issued an order approving both of the applications for approval of collective bargaining agreement and the agreement for payment of deferred compensation discussed in paragraph 9. **Exhibit M.**

10. EDA honored its obligations and made payment to Security Bank under the terms of its guaranty of the EDA loan.

11. On May 7, 1984, the Debtor filed a Plan of Reorganization (the "Plan") and Disclosure Statement. **Exhibit N.**

12. On June 14, 1984, the Debtor filed an Amended Plan of Reorganization (the "Amended Plan") and an Amended Disclosure Statement. Under its terms, the prepetition tax claims of Yellowstone County were addressed under section 3.03 of the Amended Plan.

> The unsecured claims of governmental entities entitled to priority pursuant to section 507(a)(6) [sic] of the Code shall be paid *pro rata* over a period of up to six years after the date of assessment of such taxes in annual payments commencing within one year following the "Distribution Date" [i.e., 120 days following the date the Order of Confirmation became final].

Under the terms of that Plan, EDA as the Class A Claimant retained its interest in the real estate and other assets of the Debtor. Amended Plan, Section 6.01. **Exhibit O.**

13. EDA voted to reject the Amended Plan.

14. On June 21, 1984, the Debtor filed an application to grant administration expense priority to deferred compensation claimants. On July 26, 1984, the Court approved the application. **Exhibit P.**

15. On August 9, 1984, the terms of the Amended Plan were further amended by the Debtor's "Amendment to Debtor's Amended Plan of Reorganization dated June 14, 1984" (the "Amendment to the Amended Plan"). The Amendment to the Amended Plan deleted Section 6.01 of the Amended Plan addressing the interest of EDA as the Class A claimant, and substituted new terms and conditions, including the provision that: "The secured claimant in Class A shall have a first lien on all the Debtor's real estate, buildings, machinery, equipment and fixtures until its allowed secured claim is paid in full." **Exhibit Q.**

16. In addition, the Debtor reached various agreements with its creditors, including an agreement with Yellowstone County dated August 7, 1984, as it related to its real estate tax claims against the Plant (the "Tax Agreement"). The Tax Agreement provided that in "full and complete satisfaction" of the County's real estate taxes on the Plant, the Debtor would pay $439,700.53. **Exhibit R.**

17. On August 9, 1984, the Debtor entered into an agreement with the Montana Pierce Midland Meat Industry Trust providing for payments to the trust in the amount of $137,376.00 over a period of ten years. The agreement further provided:

> In the event the [sic] Pierce is unable to confirm a Plan of Reorganization, or the proceeding is converted to [a] liquidation proceeding or in the event of any other default, the Trust priority status and entitlement to immediate and full payment shall be agreed and is hereby conclusively established and Trust shall be entitled to reasonable attorney's fees and costs incurred to effectuate a recovery.

**Exhibit S.**

18. On August 9, 1984, the Debtor and the Intermountain Retail Food Industry Pension Trust entered into an agreement for the payment in full of $41,761.59 over a period of ten years in installments of varying amounts. The agreement further provided:

> In the event the Pierce is unable to confirm a Plan of Reorganization, or the proceeding is converted to a liquidation proceeding or in the event of any other default, then the deferred payment option shall be null and void and the Trust priority status and entitlement to immediate and full payment shall be agreed and is hereby conclusively established and the Trust shall be entitled to a reasonable attorney's fees and costs incurred to effectuate a recovery.

**Exhibit T.**

19. In the Court's "Order Confirming Debtor's Amended Plan of Reorganization dated June 14, 1984, as amended," the Court approved the Debtor's Amendment to the Amended Plan, and approved the Tax Agreement with the County. EDA changed its vote to accept the Amended Plan, as amended. Thus, the Debtor's Amended Plan, as amended, was confirmed. (The Amended Plan after confirmation will be referred to as the "Amended Plan, As Amended"). **Exhibit U.**

20. Although the distribution date was December 14, 1984, the Court extended that date to March 14, 1985. However, despite such extensions, the Debtor was unable to make the first distribution on the distribution date and was, therefore, in default under the terms of the Plan.

21. On April 12, 1985, a motion to convert the case from one under Chapter 11 to one under Chapter 7 was filed by the United States Attorney on behalf of EDA. On May 9, 1985, after notice and hearing, an order was entered converting the case to one under Chapter 7. **Exhibit V.** On May 15, 1985, Sidney Thomas was appointed the Chapter 7 Trustee of the Debtor.

22. On March 10, 1989, the Court authorized the Trustee to sell real and personal property of the Debtor free and clear of liens and encumbrances. On May 13, 1991, the Trustee entered into a Buy Sell Agreement with Min Sik, Kim for the sale of the Plant for $400,000. On June 13, 1991, this Court approved the sale of the Plant, with the proceeds to be held by the Trustee until the appropriate distribution among the Debtor's creditors was determined. EDA's and the County's liens against the Plant attached to these proceeds.

23. On April 4, 1994, the Trustee filed a motion to approve the modification of the promissory note given by the purchaser of the Plant, by reducing the last payment due from the purchaser. The EDA objected to the modification, and after a hearing held on April 19, 1994, this Court sustained EDA's objections by its Order of April 28, 1994.

24. All of the assets of the estate have been liquidated, except for the remaining $100,000 due the estate by the purchaser of the Plant. Subject to final verification and audit, the following table represents the best estimate of the value of the liquidated assets, the expenses specifically attributable to the liquidation of the assets and the net amount:

| Asset | Gross Proceeds | Specific Expense | Net Proceeds |
|---|---|---|---|
| Sale of real property/Plant (does not include balance of $100,000 due on the promissory note.) | $300,000.00 | $ 57,438.98 | $242,561.02 |
| Sale of machinery and equipment | $319,067.54 | $ 97,905.43 | $221,162.11 |
| Settlement of adversarial proceeding against First Interstate Bank, et al. | $260,000.00 | $105,782.99 | $154,217.01 |
| Accounts Receivable | $ 8,782.61 | $ –0– | $ 8,782.61 |
| Sale of certain vehicles (titles did not reflect liens) | $ 29,040.46 | $ –0– | $ 29,040.46 |
| Rebate and Refunds Post-conversion refunds of Chapter 11 utility and creditor deposits | $ 5,392.98 | $ –0– | $ 5,392.98 |
| Tax refunds | $ 1,892.61 | $ –0– | $ 1,892.61 |
| Refund of Chapter 7 deposits | $ 2,120.35 | $ –0– | $ 2,120.35 |
| Lease of property of the estate | $ 2,050.00 | $ –0– | $ 2,050.00 |
| Settlement of anti-trust suit | $ 11,558.43 | $ –0– | $ 11,558.43 |

| Asset | Gross Proceeds | Specific Expense | Net Proceeds |
|---|---|---|---|
| Sale of real property in North Dakota | $ 3,778.81 | $ 351.50 | $ 3,427.31 |
| Sale of trademark | $ 200.00 | $ –0– | $ 200.00 |

24. In addition to the specific expenses associated with liquidation of specific assets, there are approximately $49,457.70 of general administrative expenses incurred by the estate to date, not including the Trustee's fees. These general administrative expenses and Trustee's fees will be allocated and described in the final proposed distribution of assets. Interest earned on the proceeds from liquidation of the assets will also be allocated. The parties preserve all their rights to review and object to the allocation of all such expenses, fee and proceeds pending submission of a final proposed distribution and an audit.

The Trustee and the County argue that upon conversion to Chapter 7, where the Plan was never consummated due to default in payment, the lien priority of the County is resurrected despite the confirmation of the amended Plan. EDA conversely contends the Chapter 11 Plan as amended effectively binds all parties as to their lien positions, and because EDA was granted a first lien in all assets under the Plan, then its lien position takes precedence over Montana law to the contrary.

■ At the outset, it is necessary to decide whether the County was afforded procedural due process as to notice of the provisions of the confirmed Plan. The Trustee and the County state the "taxes owed by the Debtor to Yellowstone County were not part of the confirmed Plan" and the amendment to the Plan filed on the date of the confirmation hearing granting EDA a first lien position was never served on the County. The bankruptcy file refutes the position of the Trustee and the County on this issue. The Disclosure Statement filed May 8, 1984, served upon all parties in interest with the original Plan of Reorganization, and approved after notice by the Court on June 19, 1984, is silent as to the County's claim. The County filed a Proof of Claim on November 1, 1983, in the sum of $410,691.93 for unpaid real property taxes for the years 1979 to 1983. Three additional claims were filed the same date in the sums of $1,743.13, $3,970.62 and $1,977.01. All of the claims were filed as priority, not secured, claims. In the Plan of Reorganization, section 3.03 *Taxes*, provides that the "unsecured claims of governmental entities entitled to priority pursuant to section 507(a)(6) [2] of the Code shall be paid pro rata over a period of up to six years after the date of assessment of such taxes in annual payments commencing within one year following the distribution date." This Plan provision is consistent with § 1129(a)(9)(C) of the Code. The Court then gave timely notice of the confirmation hearing set for August 9, 1984. The only objecting creditor was IBM.

On the date of the confirmation hearing, counsel for the Debtor presented to the Court specific agreements signed by various creditors. As the agreed statement of facts discloses, the Debtor and the County (by its county commissioners) executed an agreement under date of August 7, 1984, **Exhibit R,** in which the entire claim of the County was fixed at $439,700.53 (for unpaid taxes ending in 1983), and the County agreed to change the term payment from 6 to 10 years, despite the Code provision of § 1129(a)(9)(C). The Order confirming the Plan specifically references the County agreement and the amended Plan so provides for such payment. At no time in the confirmation process did the Debtor ever challenge the Proofs of Claim of the County filed as unsecured priority claims. The County cannot have both secured and unsecured status. If the taxing authority had claimed secured status, it would have been legally impermissible to rely in the Plan on § 507(a)(6), which applies only

2. Due to amendments post 1978, section 507(a)(6) is now 507(a)(7).

to unsecured claims. *See, e.g., In re Florida Engineered Const. Products, Corp.,* 157 B.R. 698 (Bankr.M.D.Fla.1993) (property tax claim properly asserted as a secured claim cannot be a priority unsecured claim under section 503(b)(1)(B), or § 507(a)(1)). Indeed, the entire confirmation process treated the County's claims as unsecured. As to the County's claim, due process was followed. There was never any reason for the Debtor to challenge the validity of the County's claim in view of its Proof of Claim. The County cannot now take the position that it did not know of the EDA agreement and its granting EDA a first lien on the assets. As held in *In re Coastal Alaska Lines, Inc.,* 920 F.2d 1428, 1431 (9th Cir.1990), the County was on inquiry notice of all matters in the Plan.

> [W]hen the holder of a large, unsecured claim ... receives notice from the bankruptcy court that its debtor has initiated bankruptcy proceedings, it is under constructive or inquiry notice that its claim may be affected, and it ignores the proceedings to which notice refers at its peril. *Id.*

Indeed, the County, after notice of the Amended Plan, consented in writing to a change in the Plan to defer the payment from 6 to 10 years. Constitutional due process was thus accorded to the County.[3] In sum, the County consented to treatment of its claim under the Plan, and cannot now be heard to complain. Tax claims under the Code and Montana law can be complicated. Under the facts of this case, the admonition given in *In re Broadway 704–706 Associates,* 154 B.R. 44 (Bankr.S.D.N.Y.1993), where the city taxing authority attempted to assert an administrative claim in lieu of its secured claim in order to be paid in full, is appropriate.

> The city may not have it both ways; it may not claim the right as a lien creditor when it is desirable, and the status as an unsecured post-petition administrative claimant

under 11 U.S.C. § 507(a)(1) when it chooses.

*Id.* at 46 (citing cases).

The fact the County did not assert its secured position on the pre-petition taxes binds the County as is hereafter discussed. The County's claim to have no knowledge as to the treatment of EDA's claim is without legal basis because the County agreed to the treatment of its claim as filed.

Throughout the reorganization process, the claim of EDA (i.e., Security Bank) was treated as a secured claim. The Plan filed May 8, 1984, of which the County had notice by mailing, specified that the Security Bank as a Class A creditor would "retain its lien on the Debtor's real estate, equipment and machinery until its allowed secured claim is paid in full." At the risk of being repetitious, the County was never treated as a secured creditor. The Trustee and the County argue the agreement (Exhibit R) is silent as to subordination of the County tax lien, and therefore the Plan's confirmation did not alter the County's secured position. That argument fails to recognize the binding effect under the Plan on the County's claim for taxes for the years 1979 to 1983.

■ This Court addressed the effect of confirmation of a Chapter 11 Plan in *In re Kessner,* 10 Mont.B.R. 141, 142–143 (Bankr. Mont.1991):

> The law is well settled as to the effect of confirmation of a Chapter 11 Plan as stated in *In re Holywell Corp.,* 93 B.R. 780, 783 (S.D.Fla.1988), implementing 11 U.S.C. § 1141, to wit:
>
> > The provisions of a confirmed plan bind all parties whose rights are affected by the plan, regardless of whether they voted to accept it. *In re Sanders,* 81 B.R. 496, 499 (Bankr.W.D.Ark.1987). "Once the confirmed plan has become consummated, it becomes the law of the case." *In re Jartran, Inc.,* 76 B.R. 12[3], 125 (Bankr.N.D.Ill.1987).[4] Further, "a party

---

**3.** This is unlike the case of *In re Hobdy,* 130 B.R. 318, 321 (9th Cir. BAP 1991) where the Plan arbitrarily reduced the filed Proof of Claim of a secured creditor without requisite notice or objection to the claim. In the pending case, the creditor specifically agreed to the treatment of its priority claim in the Plan.

**4.** The *Jartran* quote relied on *In re Nardulli & Sons Co., Inc.,* 66 B.R. 871 (Bankr.W.D.Pa.1986). *Nardulli* does not state a confirmed plan must be

in interest ... is bound by the terms of the plan when confirmed, even if the plan ultimately provides it with less than that to which it is otherwise entitled." *In re St. Louis Freight Lines, Inc.*, 45 B.R. 546, 552 (Bankr.E.D.Mich.1984).

The provisions of a confirmed Plan bind the Debtor and each creditor, whether or not the claim of such creditor is provided for by the Plan, and whether or not such creditor has objected to, has accepted or has rejected the Plan. § 1141. *See, for example, United States v. Edmonston*, 99 B.R. 995, 998 (E.D.Cal.1989), dealing with a similar provision of § 1141 [§ 1327] (confirmation in a Chapter 13 case is to be given res judicata effect to those issues that were decided, or could have been decided at the time of confirmation). The Debtors plainly could have raised their present contention at the time of confirmation, and not only failed to do so, but obtained consents from the Banks through negotiation to concur in the Plan.

The Bankruptcy Code allows for the revocation of a confirmed Plan, but only in those circumstances where the Order of Confirmation was procured by fraud. 11 U.S.C. § 1144. *In re Walker*, 114 B.R. 847, 851 (Bankr.N.D.N.Y.1990) (a court may not revoke or vacate a Chapter 13 confirmation order absent allegations of fraud). Not only are the allegations of fraud *as to the Plan* frivolous in that the Debtor agreed with the claims of the Bank, but the motion comes too late. Under § 1144, the motion must be filed "at any time before 180 days after the date of the entry of Order of Confirmation." The present motion is filed over four years after the order of confirmation. Debtors should be reminded that equity aids the vigilant, not those who slumber upon their rights. *Int'l Union, Allied Workers of America, AFL–CIO v. Local Union No. 589*, 693 F.2d 666, 674 (7th Cir.1982). Equitable powers of this Court cannot resurrect a stale legal theory where the facts were known to the moving party.

The Plan bound the County to a contractual repayment over 10 years without any lien on the Debtor's property as was consistent with the County's Proofs of Claim.

The recent case of *In re Intl. Nutronics, Inc.*, 28 F.3d 965, 969 (9th Cir.1994) is applicable on the doctrine of *res judicata.*

The doctrine of res judicata bars a party from bringing a claim if a court of competent jurisdiction has rendered final judgment on the merits of the claim in a previous action involving the same parties or their privies. *In re Jenson*, 980 F.2d 1254, 1256 (9th Cir.1992). "Res judicata bars all grounds for recovery that *could have been asserted*, whether they were or not, in a prior suit between the same parties on the same cause of action." *Clark v. Bear Sterns & Co.*, 966 F.2d 1318 (9th Cir.1992) (emphasis added).

In an attempt to overcome the *res judicata* effect of the confirmed Chapter 11 Plan, the Trustee and the County cite the following case authority that "the pre-petition secured lien of the County survives as a valid encumbrance." *In re Isom*, 901 F.2d 744 (9th Cir.1990); *Newman v. First Security Bank of Bozeman*, 887 F.2d 973 (9th Cir.1989) (a pre-code case); *Estate of Lellock v. Prudential Ins. Co. of America*, 811 F.2d 186 (3rd Cir.1987); *In re Eakin*, 153 B.R. 59 (Bankr. Ida.1993); *In re Berg Associates, Inc.*, 138 B.R. 782 (Bankr.E.D.Pa.1992); *In re Frengel*, 115 B.R. 569 (Bankr.N.D.Ohio 1989). The County and Trustee have misconstrued the application of lien survival in a Chapter 7 case. *Isom, Lellock, Newman, Eakin*, and *Frengel* were Chapter 7 cases which applied the well-settled doctrine that while the discharge order under § 727 extinguishes the personal liability of the Debtor, a valid secured lien survives discharge. *Isom, supra*, at 745; *Eakin, supra*, at 60; *Lellock, supra*, at 188. *Berg*, a Chapter 11 case, properly notes—

With respect to the Defendant's lien against the property, it seems clear that, *unless the Plan specifically provided for a*

consummated to bind the creditors under § 1141. In fact, *Nardulli* reaffirms that upon conversion, "[S]ection 348 does not imply the revocation of the confirmation order or any other

valid order. After a confirmation, the conversion of a case does not revoke valid consummated orders." *Id.* at 881. Thus, both cases sustain the *res judicata* principle of § 1141.

*different treatment*, those liens would pass through the bankruptcy unaffected (citing case) (emphasis added).

*Berg* at 787, 788. The argument of the County and the Trustee is thus misplaced.

■ Finally, the Trustee contends that even if the Plan with its amendments pursuant to the agreements with creditors altered lien rights, the County's first lien is still preserved because, despite confirmation of the Plan, there was never any substantial consummation, so that the Plan with its *res judicata* effect is a nullity. The Trustee cites a prior opinion of this Court (*Thomas, Trustee v. First Interstate Bank*, Adv. No. 487/0033), which cited *In re Matter of Silver Mill Frozen Foods, Inc.*, 23 B.R. 179 (Bankr. W.D.Mich.1982). That case held:

> Confirmation of a plan that provides upon default for conversion to Chapter 7 is not res judicata on all issues until the plan is fully consummated.

*Id.* at 183.

A careful reading of *Silver Mill* shows that the confirmed Plan itself contemplated a conversion to Chapter 7 upon default, which, the Court held, under the Plan, gave the creditors all of the rights they would enjoy under Chapter 7. There is no similar provision in the Debtor's Plan in this case. Moreover, under § 1141(c), the reorganized Debtor is vested with the estate property free and clear of claims and encumbrances of creditors, except to the extent that provision is made for such claims and interests in the Plan. 5 *Collier on Bankruptcy*, ¶ 1141.01[3], p. 1141–10 (15th Ed.). The decision of the court in *Thomas v. First Interstate Bank, et al.*, no. 487/0033, a preference action, is distinguishable on grounds there was no notice given of the agreement between the Bank and debtor, whereas in the case *sub judice*, notice of the Plan confirmation hearing was clearly made. The agreement at issue in *Thomas v. First Interstate Bank* was never incorporated in or made part of the Plan. It preceded confirmation by several months (October 11, 1983). The Order of July 15, 1988, specifically references the fact that the "Bank's claim was not subject to the Plan." In sum, this Court held that *res judicata* simply did not apply because the agreement

was never litigated, or subject to any court order upon notice to all parties-in-interest. Further, in *Thomas v. First Interstate Bank*, this Court distinguished the two situations, citing *In re Blanton Smith Corp.*, 81 B.R. 440 (M.D.Tenn.1987), which gave *res judicata* effect to a creditor's agreement even after conversion to Chapter 7. Moreover, *Blanton Smith* cites and discusses *Silver Mill* stating:

> The court, nonetheless, found that in that case, the confirmed plan became a nullity upon conversion of the case to one under Chapter 7. The basis of the holding, however, was that the confirmed plan of reorganization itself provided for conversion to Chapter 7 in the event of default. From that plan provision, the *Silver Mill* court found that the parties had "implicitly agreed" that upon conversion they would no longer be limited to the provisions of the plan but rather, they would be entitled to the rights and protections of Chapter 7. In the case at bar, the parties had no such "implicit agreement." In fact, the plan provisions granting perfected security interests to the appellants provide for their continued application even in the event of a liquidation. The Court therefore finds the *Silver Mill* case to be unpersuasive.

*Blanton Smith* at 444.

The above cases clearly pronounce and apply the *res judicata* doctrine, looking to the confirmed plan to determine the rights of the creditors upon conversion. With the confirmed Plan providing for the agreed treatment of the two creditors in this case, and with the overwhelming authority consistently applying § 1141 to bind those creditors, it is clear that failure to consummate or complete the Plan does not render the *res judicata* doctrine inapplicable. The Trustee's argument is thus without merit.

■ The Court also notes that the doctrine of judicial estoppel bars the County's present position. That doctrine provides that where a party assumes a certain position in a legal proceeding, i.e., where the County creditor asserted an unsecured priority claim to be paid over 10 years, and succeeds in maintaining that position, as the County agreement and Plan provides, such party

may not thereafter, simply because its interest have changed, assume a contrary position, especially if it be to the prejudice of an adverse party (EDA) in the original proceeding. *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414 (3rd Cir.1988).

When the Debtor recognized it could not consummate the Plan, EDA moved to convert to Chapter 7. The Court granted that motion. This then brought into play the application of § 348 of the Code. That section dealing with conversion to Chapter 7 after confirmation of a Chapter 11 Plan is discussed in *Matter of Pavlovich,* 952 F.2d 114 (5th Cir.1992). *Pavlovich* holds:

> Fourth, Bankruptcy Code § 348 governs the procedure upon conversion of the case. Because conversion of a case constitutes an order for relief under Chapter 7, to which the case was converted, 11 U.S.C. § 348(a), and such an event triggers a first meeting of creditors under 11 U.S.C. § 341(a), new opportunities arise for certain creditors to contest Pavlovich's Chapter 7 discharge or the dischargeability of particular debts. Bankruptcy Rule 1019(2); Advisory Committee Note to Rule 1019(2). We adopt, as far as it goes, the reasoning of the Eighth Circuit in *F & M Marquette National Bank v. Richards,* 780 F.2d 24, 25–26 (8th Cir.1985). The Eighth Circuit noted that § 348(a) provides that "those provisions of the Code which are keyed to the date of entry of the order for relief for their operation are unaffected ... by conversion." *F & M Marquette National Bank v. Richards,* 780 F.2d at 26 (citing *2 Collier on Bankruptcy, supra* ¶ 348.02). The time for filing dischargeability complaints, however, is keyed not to the date of the order for relief but to the first date set for the meeting of creditors. *See* Bankruptcy Rule 4007(c). For purposes of the dischargeability of debts, the conversion becomes the order for relief in the converted proceeding. 11 U.S.C. § 348(b). Thus, all debts that arose before the date of conversion are discharged, "[e]xcept as provided in [11 U.S.C. § 523]." 11 U.S.C. § 727(b). As the Eighth Circuit held, "[i]t necessarily follows from the interplay of these statutory provisions that a conversion from Chapter 11 to Chapter 7 provides creditors with a new sixty day period in which to file their dischargeability complaints 'following the first date set for the meeting of creditors held pursuant to § 341(a)' in the converted chapter 7 proceeding." *F & M Marquette Nat. Bank v. Richards,* 780 F.2d at 26.

*Pavlovich* at 117–118.

*Pavlovich* concludes as to pre-petition claims dealt with in the Plan after conversion to Chapter 7—

> Nothing in the statutory provisions dealing with plan confirmation suggests that, once the process leading to confirmation is complete, post-confirmation events other than a § 1144 revocation order or an appellate court order will mark its *res judicata* impact upon the parties bound by the plan.

*Id.* at 118.

However, *Pavlovich* also notes that post-confirmation claims arising between the date of confirmation and conversion are treated differently.

> It makes no sense to interpret § 348(d) as somehow retroactively bringing post-confirmation claims within the terms of the debtor's plan and then holding them to *res judicata* discharge effected by the plan.

*Id.* at 118.

■ Thus, tax claims after the year 1983, i.e., any claim for taxes after 1984 and subsequent years, are not bound by the provisions of the confirmed Plan and must be treated according to state law.

I also note the binding effect of confirmation of the Chapter 11 Plan from the language of *In re Barton Industries, Inc.,* 159 B.R. 954 (Bankr.W.D.Okla.1993).

> The authorities cited above should make it clear that, in the absence of due process violations in the confirmation process, such is simply not the case [that the parties are returned to their pre-confirmation positions], whether the case remains open, is converted, is dismissed or remains open after such default.

> As is discussed above, it has been established that the provisions of a confirmed plan of reorganization, where all creditors have been provided reasonable notice of

the effect of the plan upon their claims and liens, and a reasonable opportunity to object and to be heard, are *res judicata* and not subject to collateral attack. This is true even in cases where the bankruptcy court did not have subject matter jurisdiction to deal with matters provided for by the plan.

*Id.* at 961.

Determining whether post-confirmation, pre-conversion taxes constitute a lien against the real property of the Debtor superior to the first lien of EDA must be resolved by application of state law. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re Days California Riverside Partnership,* 27 F.3d 374, 375–76 (9th Cir. 1994). Accordingly, the issue as to 1984 taxes must be resolved by application of Montana law. Such tax claim is not treated in the agreed statement of facts. However, on April 9, 1985, the County filed "Priority Real Estate Taxes" in the sum of $84,796.65, plus penalty at two percent (2%) and interest at ten percent (10%) per year for real estate taxes for the year 1984. Conversion of the case to Chapter 7 was entered May 9, 1985.

■ The Court has held in *In re Granite Lumber Co.,* 63 B.R. 466, 469 (Bankr.Mont. 1986), that tax liens assessed against real property are superior to a first lien or mortgage, even though the mortgage was first in time. *In re Brilz,* 96 B.R. 308, 310 (Bankr. Mont.1989) holds:

> Under § 15–16–401, M.C.A., every tax due on personal or real property "has the effect of a judgment against the person, and every lien created by this title has the force and effect of an execution duly levied against all personal property in the possession of the person assessed from and after the date the assessment is made". From this statute, Missoula County derives secured creditor status. *See, In re Granite Lumber Co.,* 63 B.R. 466, 469 (Bankr.Mont. 1986), citing *United States v. Christensen,* 218 F.Supp. 722, 728–29 (D.Mont.1963) (liens for real and personal property taxes are superior to a mortgage, except to the extent of penalties and interest).

■ Under § 724(b)(3), tax liens are set as a third priority position for payment after expenses of administration and wage claims. *In re Granite Lumber, supra,* at 470–471. Thus, the 1984 tax claim of Yellowstone County is entitled to a secured lien position prior to the EDA mortgage under Montana law. I further note that after conversion to Chapter 7, that interest and penalties for taxes incurred during the administration of the Chapter 11 case do not continue to accrue against the bankruptcy estate upon conversion to Chapter 7. *In re Sun Cliffe, Inc.,* 143 B.R. 789, 790 (Bankr.Colo.1992); *In re Mesery,* 139 B.R. 34, 36 (Bankr.Wyo.1992). *Contra: In re Peter DelGrande Corp.,* 138 B.R. 458, 462 (Bankr.N.J.1992) (dealing with federal withholding tax liability). The Court concedes this issue has not been addressed by the parties.

In summary, both motions for summary judgment will be granted in part and denied in part. After expenses of administration, the County will be granted a first lien priority for its post-petition, pre-conversion tax claim in the amount of $84,796.65 against the net proceeds of the estate. With respect to the remainder of proceeds from the liquidated estate, however, EDA will be granted a first lien position.

IT IS ORDERED the Trustee's motion to amend the complaint is granted; the Trustee's and EDA's motions for summary judgment are each granted in part and denied in part.

IT IS FURTHER ORDERED the Clerk shall enter a separate Judgment setting forth the following determination of respective lien priority of the EDA and Yellowstone County against the property of the estate:

> After expenses of administration, Yellowstone County is granted a secured lien position prior to the EDA mortgage to the extent of its claim for post-petition, pre-conversion tax claim in the amount of $84,796.65, and

> EDA is granted a first lien position with respect to the remainder of estate property.